May it please the court, my name is Beth Angelone and I represent the appellates today. Here CCISD, Copperas Cove, failed to timely evaluate the student T.P. and CCISD failed to provide him with the individualized instruction he required in order to learn how to read. These failures frustrated T.P.'s opportunity to become a productive, self-sufficient member of society, as envisioned by the IDEA. T.P. remained on a first-grade reading level over the course of one and a half years, despite having an average ability to learn and an average ability to make progress. As such, T.P. is entitled to remedy. Of the five issues raised by the appellates before this court, I'll be discussing two. First, the court erred in finding CCISD's use of an assessment screener, which delayed T.P.'s evaluation of the provision of services, was justified. Second, the district court erred in failing to answer the fundamental question of whether four months of reading progress over the course of a year and a half was meaningful and appropriate in light of T.P.'s average ability to learn. While the district court correctly found that the delay in T.P.'s evaluation caused him harm by delaying the provision of services, the district court erred in giving blind deference to CCISD's use of a screener, which delayed the provision of services for the entirety of T.P.'s second-grade year. The relevant facts the court needs to be aware of in this case is that T.P. was diagnosed with autism, ADHD, and he also has a specific learning disability in reading and related disorders. Namely, he has dyslexia. He enrolled in Copperhead's Cove in September 2017 of his second-grade year, and he came with an IEP that indicated he had significant reading deficits that required individualized instruction. During that initial transition period of his enrollment in Copperhead's Cove, Copperhead's Cove conducted two reading screeners of T.P. The Fontas and Pinnell assessment screener placed him at the first-grade reading level at the beginning of the second-grade year. Also in October of 2017, Copperhead's Cove conducted an eye-ready screener, which can be found at 1328 in the record. This screening assessment determined he was reading at a kindergarten to first-grade level, where he remained for the entirety of his second-grade school year. After the initial screener was conducted, CCISD convened an IEP meeting and determined T.P. remained IDEA eligible, but only as a student with a speech-language impairment and other health impairment for ADHD. Despite having a reasonable suspicion at this point that he may have an additional disability of specific learning disability reading, CCISD failed to refer him for such an evaluation. In December of his second-grade year, T.P. was again assessed using the Fontas and Pinnell and the eye-ready assessments and was found to not be making any progress. Even in December, when he was again screened and found not to be making progress, the IEP team did not refer him for evaluation. In January, concerned with his lack of progress, the parent requested an evaluation for dyslexia, and she believed that he was going to be appropriately assessed. But instead, two weeks later, CCISD merely conducted a fifth screener using the WIST. Despite finding that T.P. had an average ability to learn, the WIST scores were so low, they couldn't even be scored in much of the assessment. It was only then in April that CCISD sought a full and formal evaluation of T.P. and presented parent with consent, which she signed the very same day. Yet, an evaluation was not completed until May of 2018, and the IEP team didn't meet until September of the next year to determine if T.P. required specialized instruction for his reading disabilities. Similar to the student in Preciado v. Board of Education, when T.P. started his third-grade year, he was placed in the Wilson Reading Program due to his disabilities. But similar to the student in Preciado v. Board of Education, the teaching of the Wilson Program was not reasonably calculated to improve his reading, nor did it provide him with appropriate individualized support. Specifically, his reading teacher, Ms. Stone, testified in the underlying hearing that she was not trained to teach Wilson in a group setting. She could not provide individualized instruction due to the large size of the student group. She moved all of the children in the program through the levels, regardless of any student's mastering. She did not provide any progress monitoring, other than to vaguely report T.P.'s progress was not as expected. And she testified that the program was not implemented with fidelity, in that T.P. was supposed to receive four sessions per week, but he typically only received two. And her testimony can be found at 2267 and 2291-92. Consequently, with the delay in services and then not having individualized services, T.P., again, only made four months of progress over the course of a year and a half. Additionally, T.P.'s lack of progress should be no surprise, given T.P.'s IEP was not appropriately calculated and aimed for very low progress, if any at all. Specifically, when T.P. started the Wilson Reading Program for his third-grade year, the goal in his IEP aimed for regression, not progress. Specifically, his goal in September of 2018, which can be found in the record at 1404, called for T.P. to read at his instructional level, with fluency and comprehension at 90% accuracy. But, according to the Fontas and Pinnell results obtained in September of 2018, just before this goal was created, T.P. could already read at an independent level, a much higher level, with 94% accuracy. Meaning, he had already mastered this goal prior to the goal's inception. Consequently, because Copper's Code delayed the evaluation provision of services, and because Wilson was not individualized to T.P.'s needs, and because the IEP was not appropriate for T.P., it should be no surprise that he only made four months worth of progress over the course of a year and a half, despite his average ability to learn. There was no reason, in this case, to delay his re-evaluation and provision of services by using a screener. During the underlying hearing, CCISD staff testified, and the District Court justified, CCISD's process of using a screener to delay re-evaluation, because CCISD's evaluation, according to the reading teacher, and I quote, a long process, and we don't like to do that to students unless we really need to see if they probably do qualify, or if they might qualify. However, Copper's Code was aware of the importance of the data and results, as they consistently showed he was not making adequate progress in reading. Certainly, Copper's Code was aware in December, when it conducted its middle-of-the-year assessments, that T.P. was not making progress, and they were absolutely aware of the need to re-evaluate when parents asked for an evaluation in January of his second grade year. There was just no reason, in this case, to use another, a fifth screener, to delay T.P.'s formal evaluation and provide him with the services and the individualized instruction that he required. The District Court erred in its analysis of the use of the screener, and in contradiction to this Court's finding in Spring Branch v. O.W., that interventions and screening assessments cannot be used to delay the evaluation or the provision of services. The District Court, in this case, actually ruled in the opposite, saying that it was justified. Second, the Copper's Code's justification that the need to determine if a child qualifies before evaluation for possible eligibility is also impermissible. As the court in Cary Ray explained, the threshold increase, not whether or not the student actually qualifies for services, but rather whether students should be referred for an evaluation. Excuse me. Here there was plenty of evidence with the five screeners that he should have been referred for an evaluation. Here the district had obvious, there were obvious signs of a reading disability and obvious signs that he required individualized instruction to address his reading disability. Counsel, I just want to be clear. How long a delay are you complaining about? I mean, we know how much time transpired between the time of the screening and the time of the full. How long a delay are you complaining about? In other words, how much time are you saying was lost? I'm saying his entire second grade school year was lost, Your Honor. They were on notice in October when they completed those first screeners that he required specialized instruction because he was a year behind at that point. In December, he was still a year and a half. If you use the parent's evaluation request, then that would put them at. So what happened in that period of time was you say he had four months worth of progress? In a year and a half. The Fontas and Pennell data shows he only made four months worth of progress over the course of a year and a half. And according to you, if they had done what they were supposed to do, how much progress would he have made in that same period of time? I don't know that I can say how much he would make specifically, but there are cases and data that show that children can make over a year's worth of progress in a school year if they're provided with appropriate instruction. And I believe Amicus will be discussing that a little bit more in detail. But we are seeking to close or narrow the gap. And in T.P.'s case, we were actually expanding the gap. Not only was he not making progress commensurate with his own abilities, but he wasn't even making progress that would ever catch him up and ever allow him to meet the goals of the IDEA. Because his program really did nothing to help address his reading disabilities. Is one of your concerns that he should have been put in summer school or that summer when the screening was done? I think that for the extended school year services, yes. At that point, they had plenty of information that he was likely to regress in his reading skills, and that would have been their opportunity to provide that individualized instruction. If you look at the Fontas and Pinnell reading scores, even when he repeated assessments over the summer, his scores were slightly reduced. So he would have qualified for summer services, yes. Okay. Well, I guess I may have either misread or misunderstood, because I thought I read something about his grades being high enough that he wouldn't have been eligible for summer school that summer. That was for general education summer school. And even when looking at the grades, the case manager and the teachers weren't even aware that those grades that were reported on his report card were not actually accurate indicators of progress. His actual mastery using his true grades. This is the argument that the grades were inflated. Absolutely. And if they had not been inflated, he would have qualified for general education summer school. But because he's an IDEA student, he should have been provided with extended school year services under the IDEA. Who inflated grades? His teachers. So in second grade, his teachers made a determination that they would not report any failing grades in the gradebook. So, for example, in second grade, he had the gradebook reports that he made a 50. Grades were not accurate indicators of his progress. Right, because they were not reported correctly, so to speak. So, for example, in second grade, his average was actually a 52 based on his actual scores. But the teachers reported it, I believe, as a 76 on the report card, which made him ineligible for summer school. Parent was not aware that he was actually failing and not mastering the content in those courses. And getting back to the assessment timeline, in terms of the parents' request in January, the district court seemed to have placed blame on the parents for not objecting to Copper's Co.'s violations of using the screener in order to delay, that the parents somehow justified delaying the evaluation because they didn't know to object. But according to Hicksey Purchase Line School District, a child's entitlement to special education should not depend on the vigilance of the parents, who may not be sufficiently sophisticated to comprehend the problem. So while the district court and Copper's Co. criticized the parent for not using magic words when requesting an evaluation, a request for evaluation is implied when a parent informs the school district that the child may have special needs. So delaying the evaluation or delaying seeking consent from the parent after she made the request in January, which delayed the evaluation and delayed the provision of services, was a clear violation of the IDEA. And there was no justification that CCISD could provide short of the parent not complying, which she did because she signed the consent form the very same day. The district court then went on to say, relying on Raleigh, that... I'm sorry, Your Honor, if I may briefly conclude. Appellants asked this court to reverse the decision of the district court, affirm the remedies awarded by the hearing officer, and remand for award of prospective compensatory education in order to place T.P. in the position he would have been for, but for Copper's Co.'s violations. Thank you. Is it Ms. Seidman? Yes. May it please the court, my name is Ellen Seidman, and I'm here today on behalf of COPA, the Council of Parents, Attorneys, and Advocates, amicus curiae. We have more than 375 members in the Fifth Circuit, and we're here today because we believe the Fifth Circuit's Michael F. standard needs to be tweaked to incorporate the substantive standards set out in the Supreme Court's Andrew F. decision. That way, school districts will know they need to set ambitious programs with challenging goals so that students can make effective progress and not allow low expectations to yield inadequate programs that let children fall behind further every day. The first Michael F. factor, individualization, needs to include the requirement that the program be appropriately ambitious for the student with challenging objectives. In this case, the district court did not specifically address whether the IEP in this case had ambitious goals and challenging objectives. Instead, the court- Have you already addressed these arguments, though? Is this a new issue for us, or have we already wrestled with the notion that the Supreme Court's changed our standard? This court has never addressed the specific question about whether the standard should be tweaked. In the E.R. case, the court said that Andrew F. did provide greater clarity to the standards, and so this would merely pick up on the E.R. case and incorporate the Andrew F. standards in the Michael F. test. So this court has the opportunity to clarify the standard. It's really important because in this case, as you can see, the district court followed the sort of procedural checklist approach to the IEP and to the individualization and did not specifically address whether the specific goals and objectives in the IEP were sufficiently ambitious, which is really the question in Andrew F. Whether a student with this student's disabilities and abilities had the- should have been expected to make more progress. And I think the point that Ms. Angelone made that when you looked at the student's progress in September 2018, he had already made the progress that was in the IEP, and the IEP did not provide a greater goal, an ambitious goal or objective. And for a student with average ability, like the student here, at least a year's worth of educational progress in a school year would be reasonable to expect. And, you know, our concern is that if this court used the Michael F. standard and clarified it, tweaked it a little bit to incorporate the standards from Andrew F., it would make clear to the district courts and also to school districts and hearing officers that when they analyze these standards, they have to look not only at whether the school district followed the procedural test, you know, about what procedures were followed and whether there was a reading goal, but looked at the substantive reading goal and asked, was this reading goal sufficiently ambitious for this particular student based on his abilities? So we think this clarification is important and it's certainly well indicated in E.R. that Andrew F. did provide greater clarity. Your time has expired. Thank you, Your Honor. Ms. Robinson? May I please the court? I am Bridget Robinson, and I am representing the Copperas Cove Independent School District, which was the defendant in the court below and is the appellee in this case. This court should affirm the district court's well-reasoned order rendering judgment in favor of the Copperas Cove Independent School District. The district court did not abuse its discretion in denying plaintiff's request for additional evidence. Further, the district court did not err in finding the school district complied with the Individuals with Disabilities Education Act, also known as IDEA, and provided T.P. with a free, appropriate public education. T.P.'s full and individual evaluation was appropriate, and the school district timely and properly evaluated, identified, and placed T.P. The district court correctly held that the school district did not violate IDEA's procedural requirements, did not commit any substantive violations, and that plaintiffs are not entitled to relief. There is no reversible error. First, the district court properly exercised its broad discretion in denying plaintiff's request for additional evidence, observing that the administrative record was extensive, consisted of over 1,000 pages of documents, and was vast and detailed. The district court correctly determined that four of the five documents plaintiffs proffered as additional evidence were actually improper hindsight evidence on the issue of eligibility. As the district court correctly observed at page 453 of the Record on Appeal, the main issues before the hearing officer at the due process hearing in December 2018 were whether the school district properly evaluated T.P. and failed to find him eligible as a student with a specific learning disability, or SLD. As the district court noted, that determination can be easily discerned by reviewing the issues for decision at page 672 of the Record on Appeal. The district court properly applied this court's decision in Lisa M. v. Leander ISD, which held that courts should refrain from accepting hindsight evidence when reviewing a hearing officer's eligibility determinations because such findings are based on a snapshot in time and what information the school district had to inform its decision regarding a student's eligibility. As this court stated in Lisa M., quote, at the eligibility determination moment, therefore, incorporating events that occur afterwards would be incongruous and indeed can only invite Monday morning quarterbacking, end quote. The district court also correctly concluded... Counsel, this hindsight evidence, which apparently came from our precedent, I guess hindsight, is that tantamount to something that's irrelevant evidence? Is that what that means? It's inappropriate evidence, Your Honor, because the determination of whether the school district properly assessed the student has to be viewed with the information known to the school district at that time. I understand that, but I guess aside from our cases, I haven't heard the term hindsight as a basis for excluding evidence. But anyway, I guess hindsight just means hindsight. I think, Your Honor, that while some cases do refer to it as hindsight evidence, some courts refer to it as inappropriate simply because it did not exist at the time, and therefore some cases may refer to it as later acquired evidence or nonexistence evidence and use different factors. Similarly to properly excluding the four documents that were hindsight evidence that were not in existence at the time, the district court also correctly concluded that plaintiff's December 2018 private speech evaluation was improper additional evidence. As the district court observed, it was completely inconsistent for plaintiffs to proffer the private speech evaluation by Saba Hernandez when they so adamantly and successfully fought to keep all speech evaluations out of evidence throughout the entire due process proceedings. Prior to the due process hearing, plaintiffs filed a motion to strike when the school district offered a November 2018 speech evaluation, arguing that the hearing officer lacked subject matter jurisdiction to consider the evaluation. Plaintiffs claimed that TP speech eligibility was not raised by plaintiffs in their request for special education due process hearing, and plaintiffs objected to the hearing officer's consideration of TP speech eligibility. Plaintiffs made it clear that if the hearing officer excluded the school district speech evaluation, they would not seek to offer the December 2018 Hernandez speech evaluation. The hearing officer sustained plaintiff's objections to the Coppers Cove Independent School District's November 2018 speech evaluation and excluded the school district's speech evaluation from the record. As the school district's speech evaluation was excluded based on their objection and their contention that speech evaluations were not admissible, plaintiffs did not offer the Hernandez speech evaluation, although it was available and could have been made part of the hearing record. The IDEA's additional evidence provision is not meant to further the type of inappropriate gamesmanship plaintiffs exhibited when they successfully excluded from evidence the school district's competing speech evaluation so they could then turn around and ask the district court to consider their untimely proffered speech evaluation. The district court correctly determined that allowing evidence which was available at the time of the due process hearing, but strategically withheld in order to convince the special education hearing officer to disallow the school district's competing speech evaluation, as well as the elicitation of testimony regarding the speech evaluation, would turn the administrative hearing into a mere dress rehearsal, which this very court warned against in ER versus Spring Branch ISD. Second, the district court did not err in concluding that the school district did not procedurally violate the IDEA. Contrary to plaintiff's allegations, there was no unreasonable delay in TP's dyslexia testing. Plaintiff's reliance on the timeline in Volume 19 of the Texas Administrative Code Section 89.1011 is flawed. That provision is not applicable as it addresses full and individual initial evaluations, not re-evaluations like TP's dyslexia testing. It is undisputed that when TP enrolled in Copperas Cove ISD in the fall of 2017 from Wake County, North Carolina, he already had in place an IEP based on an IDEA compliant full and individual initial evaluation conducted by Wake County. Even if Section 89.1011 were applicable here, which it is not, plaintiff's alleged timelines are incorrect because the 45-day deadline to complete testing would not be triggered by the parent's request for an evaluation. Instead, it would be triggered by parental consent. Moreover, days are defined as school days, which excludes intervening school holidays and the school district's summer break. In addition, there was no unreasonable delay caused by the school district's use of a dyslexia screening to assess TP's reading deficiencies. While TP had problems with reading, that is precisely why throughout his enrollment in Copperas Cove ISD, he received special education services to address reading. TP's teacher did not see any indications that TP had dyslexia over the first three months that TP was enrolled. He knew letters, was able to read small sentences, was not reversing letters, and was doing well and was able to track what was being read. The dyslexia screener was performed two weeks after the parent's request for dyslexia testing. When the district sought and received consent for further dyslexia testing in April 2018, the explicit goal was to complete testing by August 23, 2018. That was communicated to the parent in an ARD meeting and in notice documents. The testing was completed much earlier, on May 18, 2018. The testing included the Woodcock Reading Mastery Tests, Gray Oral Reading Test, Comprehensive Test of Phonological Processing, Test of Written Spelling, an edited writing sample, and academic skills. Meanwhile, TP continued to receive special education reading services in combination with general education supports in language arts and writing, as well as a host of other accommodations. In this case, the district court did not err when it concluded that the facts provided to the court suggest reasonableness. In addition, the court correctly concluded that the school district did not act with unreasonable delay. Further, plaintiff's desire for an SLD label does not even state a claim for violation of the IDEA, which does not require school districts to classify students by disability or create an appropriate label to identify a student with a disability. Indeed, as this court articulated in Lawrence C. v. Louisville ISD, the IDEA requires appropriate services, not particular disability labels. In this case, there is no dispute that throughout TP's second grade year, even before dyslexia services were implemented, TP also received instruction in the Wilson program called Foundations, which assisted with reading and phonics. TP also received special education support and accommodations during that time. In second grade reading, TP worked with flashcards, participated in embedded reading, whole group reading, and was frequently asked comprehension questions. Third, the district court did not err in concluding that the school district did not substantively violate the IDEA. The district court correctly held that the school district met its substantive obligation under the IDEA as articulated in several cases, including Andrew F., by offering TP an individualized educational program that was reasonably calculated to enable him to make progress in light of his circumstances. The district court also correctly found that all four Michael F. factors weighed in favor of the school district because TP's educational program was, one, individualized, two, administered in the least restrictive environment, three, coordinated and collaborative, and four, provided TP positive academic and non-academic benefits. The evidence supports the district court's findings that the educational program was individualized on the basis of TP's assessments and performance, and it was reasonably calculated to enable TP to make appropriate progress in light of his individual circumstances. The district court correctly found that, when appropriate, Coppers Cove ISD properly modified TP's goals and provided different services. Likewise, the district court did not clearly err in finding that sufficient coordination and collaboration took place in implementing TP's educational services. As the court observed, the record indicates extensive participation in TP's educational plan by various professionals within the district and TP's parent, and the IEPs for TP incorporated input and collaboration of all individuals involved. Even while asserting TP did not make meaningful progress, plaintiffs themselves admit that TP made some progress. This court recently addressed how courts are to evaluate this fourth and critical Michael F. factor. In its 2020 decision in RS versus Highland Park ISD, this court held that while the student could not catch up to his grade-level peers, he demonstrated progress appropriate in light of the child's circumstances, and courts may determine that aiming for small amounts of progress is appropriately ambitious given a child's unique needs. Based upon these standards and the entire record before the district court, not only was TP's IEP reasonably calculated for him to receive educational benefit, but he made academic, behavioral, and social progress appropriate in light of his unique circumstances. Decisions such as whether a student obtained an educational benefit from a school district's special education services are underlying findings of fact, which are provided deference and reviewed for clear error. This court articulated that standard in several cases and reiterated it only recently in AA versus Northside ISD. In this case, the district court correctly determined that TP demonstrated academic and non-academic progress. The district court's underlying factual findings are well supported by the record and certainly are not erroneous. For all the reasons articulated in the school district's brief, as well as those discussed during oral argument today, and which will be discussed by the attorney for the Amicus Curia, the Texas Association of School Boards Legal Assistance Fund, this court should affirm the judgment of the district court in favor of the Coppers Cove Independent School District. Is it Mr. Totgenhorst? Yes. Thank you, Chief Judge Owen. I may please the court. No policy, precedent, or textual interpretation justifies an overhaul to the way this circuit analyzes student programs under the IDEA. The Supreme Court decision in Andrew F. does not demand judicial alteration or expansion of this court's Michael F. factors. As this court has already recognized, application of the Michael F. factors is sufficient review of a child's program under IDEA and Andrew F. What perhaps out-of-town counsel for Amicus has not realized is this court's prescient recognition of what IDEA has demanded of public schools for many years, meaningful educational benefit. Michael F. codifies this court's complete understanding of the high IDEA guarantee. The Supreme Court's decision in Andrew F. serves only to reject the approach taken in other circuits, where courts demanded far less and required only de minimis education benefit. Had the other circuits followed this court's lead, the Supreme Court's clarification in Andrew F. would likely be wholly unnecessary. Recognizing this higher threshold, the court developed the Michael F. factors, a well-reasoned litmus test of whether a student's program meets the parameters of a free, appropriate public education, and those factors remain appropriate today. The district court in this case dutifully and appropriately applied the Michael F. factors. I start with the most critical factor, the fourth factor, which demands that positive academic and non-academic benefits are demonstrated. Note the absence of the word meaningful. Appellant's attempt to work the word meaningful into this prong misapplies the correct standard, and such an interpretation conflates the holding of Michael F. True, Michael F. demands examination of an IEP to determine whether or not it's reasonably calculated to confer meaningful educational benefit. The Michael F. factors are then utilized as a tool to make this determination. Meaningful benefit need not be found in any prong of the test, the fourth included. In order to provide meaningful educational benefit, the program must meet all four factors of Michael F. Careful reading of Michael F. reveals exactly this dynamic. Quote, there are four factors that serve as indicators of whether an IEP is reasonably calculated to provide meaningful educational benefit. End quote. The district court here expressly held the student demonstrated positive academic and non-academic benefits using the exact words demanded by the factor, and properly applying it. Remember, Andrew F. demands appropriate progress, and positive benefit fits the mold of this demand. The first Michael F. factor demands the program is individualized on the basis of the student's assessment and performance. Appellant argues for rigid application of this factor, seemingly demanding recitation of all assessments and summaries of student performance. However, this circuit has expressly recognized that these factors need not be rigidly applied in any particular way, as these factors serve as guideposts for the court, and as opposed to rigid formulas. The district court examined this factor and found the program properly in its entirety, outlined the student's needs, and the plan for addressing those needs, finding the program was sufficiently individualized. The district court did not misapply the factor, simply for not expressly demanding recitation of each assessment and performance indicator, in the student's present levels. To the contrary, the court completely reviewed and properly reviewed the entire program, and found that it was sufficiently individualized based on the evidence presented. Again, the Michael F. factors are guideposts to be used by the courts to evaluate an IEP, and rigid application of Michael F. is unnecessary departure from existing precedent. The third Michael F. factor demands services are provided in a coordinated and collaborative manner by key stakeholders. Put differently, it requires, one, that services be provided, and two, they could be provided in a collaborative manner. The district court here made such an analysis, and while appellants challenged focus on the collaboration, the court nevertheless properly examined both aspects as demanded by the third factor. The second factor is, of course, not relevant. Taken together, the district court found that all factors were satisfied under Michael F., and further finding is completely unnecessary under this court's precedent. Amending the Michael F. factors to demand that courts weave Andrew F. analysis into each factor is likewise unnecessary. Amicus seek judicial alteration of how this court examines IDEA guarantee with the hope of raising the proverbial bar. This court has already recognized verbatim recitation and detailed consideration of Andrew F. is not necessary where the Michael F. factors are properly applied. Michael F. is sufficient analysis for the purposes of Andrew F. such that alteration to the factors is wholly unnecessary. I encourage this court to review carefully the demands of Michael F. and uphold the district court's dutiful application of this court's well-developed test, and I respectfully request this court avoid finding a justification to engage in judicial activism to expand or alter the Michael F. standard any further. Thank you for your time. Ms. Angeline? You need to turn on your audio. Let's try again. The IDEA is clear in 34 CFR 300-304-311 that re-evaluations must be conducted in the same manner as initial evaluations with very few exceptions. Therefore, the timelines prescribed in the Administrative Code 89.1011 are absolutely applicable. Had CCISD sought consent when parent requested evaluation, the evaluation should have been completed by March 21. In this case, the evaluation was not finalized until the following school year, and even then CCISD only placed this child in the Wilson Reading Program after it had completed the evaluation. So I think it's important to note that evaluations are not just to determine eligibility, but they also drive the provision of services and the individualized instruction. Given that this district was on notice really the entirety of his second-grade school year that he required individualized instruction, it is a tragedy that this delay in evaluation caused him to miss a year's worth of critical early intervention. Here, in terms of progress, the district court erred, much like the Tenth Circuit did in Andrew F., in holding firmly to the sum educational benefit. As the Supreme Court has held, and this court and appellants asked this court to similarly hold, the IDEA demands more. And while the appellants are aware that the IDEA doesn't require the furnishing of every special education service necessary to maximize TP's potential, it can hardly be said that TP was offered any education at all given his goals were below his level, his Wilson instruction was not individualized, his program in second grade provided zero progress. Therefore, TP was entitled to an appropriate and meaningful program, which he was denied. As to the delay that it caused in terms of getting his Wilson reading program, this court has found in Spring Branch that a 99 delay in services, using a screener to delay those services, was a violation of the IDEA, which denied faith. And in Kraywitz, even a four-month delay was a denial of faith. So here, when they had information as early as October of his second-grade year, but failed to offer individualized services, failed to offer the Wilson program, I don't know that it was individualized given Ms. Stone's testimony, is a travesty. And TP is entitled to remedy and remand for determination of appropriate remedy. Thank you, Your Honors. Thank you. This case is now under submission. We appreciate your participation today. Thank you.